Filed 5/13/15  P. v. Clay CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ERIC LAMONT CLAY,<br><br>    Defendant and Appellant. | B251482<br><br>(Los Angeles County<br>Super. Ct. No. BA351868) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig J. Mitchell, Judge.  Modified and affirmed with directions.

Marilee Marshall & Associates and Marilee Marshall for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, and Brendan Sullivan, Deputy Attorney General, for Plaintiff and Respondent.

_____

Eric Lamont Clay appeals from his convictions by a jury of seven counts of assault and sexual offenses. We remand for resentencing on count 7 and for the calculation of conduct credits, if any. We otherwise affirm the judgment.

## BACKGROUND

An amended information filed August 5, 2012 charged Clay with one count of assault by means likely to cause great bodily injury to victim D. W. (Pen. Code,[1] § 245, subd. (a)(1); count 1); one count of forcible oral copulation against victim L. R. (§ 288a, subd. (c)(2); count 2); four counts of forcible oral copulation against victim Linda M. (§ 288a, subd. (c)(2); counts 3, 4, 5, & 6); and one count of attempted forcible oral copulation against victim Laura R.[2] (§§ 664, 288a, subd. (c)(2); count 7). The information also alleged that Clay committed an offense specified in section 667.61, subdivision (c) against more than one victim, within the meaning of section 667.61, subdivisions (a) and (e). Clay pleaded not guilty.

A jury found Clay guilty on all seven counts. The trial court denied his motion for new trial, and sentenced Clay to a total state prison term of 42 years to life, with presentence custody credit. Clay filed a timely notice of appeal.

### Linda

At trial in August 2013, sixty-three-year-old Linda[3] testified that on an August evening in 2008 (she remembered it was a warm evening, but "I don't remember when I was born. . . . I don't remember no dates at all"), she was walking in the area of San Pedro Street and 7th Street in Los Angeles when she hailed a yellow van cab with blue checks. The van was dirty, with blue carpets, bucket seats in the front, and a bench seat in the back. The driver was a heavy set, round-faced black man. Linda pointed out Clay in court as the man. Clay told her to get in the back seat because papers were piled in the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] For the purpose of clarity, in the body of the opinion we will refer to the victim witnesses by their first names. No disrespect is intended.

[3] All the victims were in their 50's or 60's.

2

front passenger seat.  Linda wanted to go to Beverly Hills.  On the way Clay said, "'Oh, look over, there's a pretty young girl waiting to be picked up,'" which at that time Linda didn't think much about.  Clay said he had to urinate, and pulled into a dark alley about 20 minutes after he picked her up.  He parked the cab with the passenger side as close to a fence as possible, got out, and climbed in the back with Linda.

Clay got on top of Linda, put his hands around her throat and squeezed, saying, "'I'm going to rape you, but I'm going to choke you first.'"  Linda had trouble breathing and thought she was going to die.  Clay slapped her up to 25 times.  He pulled her to the front of the cab, sitting so Linda had to lean on her left side, and pushed his penis down her throat for a long time until he ejaculated.  He ordered Linda not to spit out his semen, and she swallowed it.  Clay said, "'I never thought I'd have a 60-year-old girlfriend,'" and made Linda "deep-throat" him again.  Clay then asked Linda if she'd ever been anally raped, and she said never; he asked if she was sure, and she said yes.  He then said he needed to ejaculate again and "'[t]hat's the only way I can finish.  Turn over.'"  Linda turned over and Clay pulled up her dress, but she did not feel any part of his body touch hers.

Clay held a piece of wood with nails in it over Linda's head and told her she wouldn't make it to the hospital if she tried to escape.  He made Linda suck his nipples, lick his testicles, and lick his anus for an hour.  Clay asked Linda how old she was, and told her he was going to take it easy on her because of her age.

Clay told Linda he would give her $10 if she got out of the cab and walked, or $5 if he drove her back.  She asked him to drive her back, because she was afraid he would run her over if she got out of the car in the dark alley, and she did not know where she was.  He took her to 11th Street and gave her $5, which she accepted just to get rid of him, although she did not want him to think that paying her made it okay:  "It's not okay.  It was still rape, no matter what."  Linda did not go to the police that day because Clay said he knew a lot of people in the area and if she told anyone, he would get them to kill her.  The entire attack had lasted around two hours.

Linda reported the incident to the police a few weeks later. On January 22, 2009, she identified Clay as her assailant in a photographic lineup, at position number 5. His hair was longer at the time of the incident, in braids that were not fresh so his hair was puffed up. Linda also identified Clay without hesitation as her attacker in a live lineup, in position number 4.

The day that Linda got into the cab, she was not working as a prostitute, was not homeless, and had not taken any illegal drugs. She did take Prozac, Abilify, and Adderall to help her cope on a daily basis. Linda had attention deficit disorder, which affected her memory, and took medication for schizophrenia. The medications did not affect her memory.

Los Angeles Police Department (LAPD) Detective Joshua Riggs testified that he interviewed Linda and took a full report. Linda described the vehicle as a yellow and blue checkered taxicab van, with a sliding door and gray interior with two bucket seats in the front and two bench seats in the back, with no windows in the back. The van was messy with papers in the front passenger seat. The driver was a light-skinned black male with a broad nose and full lips, and slanted or "'bedroom eyes,'" about six feet tall and 250 pounds. She remembered that she entered the van on 7th Street just south of San Pedro Street, and past Staples Center the car turned into an alley. Detective Riggs thought Linda described her attacker as wearing a blue hat with a brim, like a fishing hat.

LAPD Detective Carlos Garcia also interviewed Linda, who described the taxi as blue and yellow and her attacker as a light skinned male black with poufy hair. Linda also pointed to a moving company advertisement with a stick figure, and said, "that's him." Linda was uncooperative, going from calm to very aggressive and saying she would not be able to identify the suspect if she saw him again.

Investigating LAPD Officer Sharlene Johnson also interviewed Linda, who told her she had been assaulted for three hours. Linda described the suspect as having a light to medium complexion, similar to a Hispanic.

4

**L.**

57-year-old L. testified that on the day after Thanksgiving in 2008, she was walking near Los Angeles Street and 8th Street between 8:00 p.m. and 9:00 p.m. when she saw a van cab that she thought was green, with two long seats in the back and black upholstery. The driver asked her if she needed a ride and she answered yes. He asked her if she was working and she said maybe, and when he asked how much she said $10. The driver asked L. how old she was and she said 54. He told her to get in through a sliding door. L. identified Clay as the driver. L. worked as a prostitute and was addicted to crack cocaine, and had smoked $40 of crack cocaine just before being picked up. She just wanted a ride because her feet were hurting, and she and the driver did not discuss sex for money before she got in the cab.

L. became worried when Clay stopped behind a building near some train tracks by Western Avenue, got in the back seat with her, and told her she had to do what he said before she got out. If she didn't do what he said "he was going to put [her] in a concrete wall and [would not] lose a bit of sleep over it." L. told Clay she had a problem holding her bowel movements, and she soiled her pants and started crying harder. Clay flipped L. onto her stomach, told her to be quiet, and pulled her pants down, but then pulled them back up when he realized she had defecated. Clay spat in L.'s face, pulled her hair, and made her play with his testicles and suck his penis, telling her she had to swallow his semen or she would have to do it again. Clay choked and punched her with his fist, giving her a black eye, and put his hand over her mouth and told her to shut up when someone walked by with a dog. She told Clay she needed money to buy something to eat, and Clay put something in the ashtray in the back of the seat. Clay made her clean his penis with her jacket, and told her to lie down. Clay drove her a few blocks from Main Street, got out, opened the cab door, put a cigarette in her hand, and told her that if she told anyone he would put her in a brick wall.

After L. got out of the cab, she called her girlfriend instead of the police because after what Clay said to her she was afraid he would follow her. The next day her girlfriend talked her into going to the police. L. didn't know whether she talked to the

5

police on November 30. When she got there, she spoke to the front desk officer and then to LAPD Officer Deon Joseph, who saw her face and then asked her what happened; she said, "the cabdriver did it." She also met with Officer Johnson, and a sketch artist made a drawing from her description.

L. admitted she had multiple convictions for prostitution. She could not read or write. Her memory was good, and although she sometimes forgot things, when "you get assaulted, [or] get beat up, you don't forget things like that." L. had identified Clay in a photographic lineup as her attacker. A recording of an interview just after she made the identification was played to the jury. L. also attended a live lineup. The officers asked each suspect to say something. L. identified Clay, who was in position 4, on the basis of his appearance and the sound of his voice, although his hair was different from the night of the attack.

On cross-examination, L. stated that she went to the police on November 30, and could not remember much of what she told the first officer she spoke to except that she told him that her attacker was stocky. She only felt comfortable talking to Officer Joseph, telling him her attacker looked Hispanic but he was black.

LAPD Officer Jesus Toris testified that he was at the front desk of the Central Police Station on November 30, 2008, when he took a report from L. about the November 29 attack. She told him that it happened around 9:00 p.m., the cab was white and green, and the assailant was Hispanic with a dark complexion and a moustache, and had an accent.

Detective Riggs testified that he interviewed L., who told him that the driver was a light-skinned black man with a deep voice and might have had an accent. He had slanted "'bedroom eyes'" and was about six feet tall and 250 pounds. The taxi had a white top and a green bottom and a dark interior, with two bucket seats and in the rear, two bench seats. Officer Joseph also spoke to L., who had a blackened left eye and told him she had been picked up, transported, and sexually assaulted.

LAPD Detective Adolfo Contreras met with L. on January 22, 2009 to show her the photographic lineup, and gave her an admonition, recording her statement because

6

she was unable to read and write. He placed the photos face down and asked L. to turn them over, and when she did so she immediately identified Clay, circling, signing, and dating the photograph.

LAPD Detective Steve Koman conducted the live lineup on January 22, 2009, at which both Linda and L. were present, with defense counsel (who made several objections) also present. The two women were given their admonitions together and viewed the lineup together. They were admonished not to speak to each other and Detective Koman watched to make sure they did not. Either Linda or L. became visibly shaken and emotional while marking her paper, and so Detective Koman asked her to leave the room. After she left without in any way indicating whom she had chosen, the other woman made her identification.

**Laura**

Laura testified that in November 2008, she was working as a prostitute on Towne Avenue and 7th Street when a yellow and blue cab pulled over. She got into the cab through the sliding door and told the driver it was $20 for "everything," meaning sexual acts. The cab had a black interior and was messy with papers and clothes. Laura identified Clay as the driver. Clay drove around and took her to an alley on 11th Street, where he parked the cab near a wall, urinated, and came around to the back. Clay handed her the $20, grabbed it back and said she wasn't getting the money, and punched her in the head three times. Clay's shirt was open and his pants were down, and he tried to rip off her shirt. He tried to put his penis in her mouth but she pushed him away, so his penis just hit her mouth and did not go in. She did not remember seeing his penis. Laura did not want any sexual contact with Clay because he was too rough; she tried to get out of the taxi but Clay wouldn't let her.

A man came into the alley and started to go through the dumpster. Clay got in the driver's seat and began to drive away. When Laura screamed at Clay to stop and he would not, she jumped out of the moving car and ran away, trying to put her top and bra back on. Clay backed up in an attempt to run her over with the car.

7

Laura thought she was illiterate, but she knew her numbers. She was using crack cocaine in 2008 and took medication for mood swings. She had no difficulty remembering the attack.

Laura did not go to the police immediately because she was scared. Sometime later she saw Officer Joseph in his police car, using his loudspeaker to tell people that "the cab driver [¶] . . . [¶] he's hurting the chicks out here," and she flagged him down. Laura had seen her attacker three days before she spoke to Officer Joseph. Later, in a photographic lineup, she identified her attacker in position number 5 (although his hair was different). She also said it could be number 2. At trial, she testified that if she had to choose again she thought her attacker was in position number 2, although she had circled only Clay, who was in position number 5.

In a live lineup, Laura had identified the individual in position number 2 (Clay) and number 3, although she had not been sure which one had assaulted her. Now she was sure it was number 3.

On cross-examination, Laura admitted she told Officer Joseph that she didn't see any scars or tattoos on the cab driver, who was a bald, dark-skinned male with a deep voice and a mustache, and was not circumcised. She was not sober when she talked to Officer Joseph.

Officer Deon Joseph testified that he was a senior lead officer, and had worked with the prostitutes in the area to help them change their lives and report crime to the police. On December 23, 2008 he was driving down 7th Street passing out flyers (without photographs) about a man in a taxicab who was assaulting prostitutes, when Laura flagged him down, saying she knew who it was. She talked to Officer Joseph at the station, and told him that in November she agreed to engage in an act of prostitution with a driver of a yellow and blue taxi with a gray interior. The driver took back the money, ripped off some of her clothes, and was about to sexually assault her but stopped when a transient began rummaging through trash. Laura appeared sober and coherent, and her left eye was blackened. Shown a composite sketch of the suspect, she said, "'I know who that is. He tried to rape me.'" She had seen him in the area three days earlier

8

(December 20) and on December 18, trying to pick up other women. Laura described him as an uncircumcised, bald dark black male in his 40's with a deep voice and hair somewhere.

LAPD Detective Jesse Alvarado testified that on January 22, 2009, he showed Laura a photographic lineup. Laura circled the photograph in position number 5, which was Clay's photograph. She signed a statement saying: "'It looks like number 5 but his hair is different. When he attacked me, he had no hair or a moustache. I think it's him. I'm not sure. It could be number 2. If I had to make a choice, it would be number 5. If I saw him in person, I could identify him.'"

LAPD Detective Barry Telis testified that he assisted at the live lineup on April 28, 2009. A defense attorney and defense investigator were present, and Laura was the only witness present. Laura stopped the lineup and said she thought number 3 was her assailant. Each of the men in the lineup was asked to say, "'You ain't getting this money tonight,'" and Laura said number 3 sounded like her assailant. Laura then asked if she could pick someone else, and after she was told that she could, she said, "'It's between 3 and 2.'" Clay was in position number 2.

**D.**

D. testified that she was currently in custody for an unrelated drug matter, had many convictions for prostitution and drug-related crimes, "like[d] crack," and did not read or write very well. At the end of 2008, D. was in Gladys Park on 6th Street during the day, high on crack, when a van taxicab drove up and the driver, who was black and wearing a black stocking cap, asked, 'Would you like some crack or some money or something to go fool around?'" The cab was yellowish green or fluorescent green, in two colors, half yellow fading into another color. She said yes and got in the sliding door, intending to have sex with the driver for money or crack. The driver drove the cab to a secluded area like an empty parking lot. He told D. to get into the back, and she went to the back row of the two bench seats. D. took off her clothes, and the driver told her to move into the middle portion of the back. He got into the back of the cab with her and folded the seat down. The driver had D. lie on her stomach and rubbed oil on her

9

buttocks; she thought he might have penetrated her anus but wasn't sure. She noticed he had scars and bite marks on his hands, which looked like photographs of Clay's hands shown to her at trial.

The driver put on gloves with the fingers cut off, and asked, "'Do you know why I brought you here?'" D. said no, and he continued, "'I brought you here because I bring all the women here to hurt them. And I—and I rip their body parts apart, and the more harm I do to them the harder I get.'" The driver was holding D. down, but she grabbed the van window and tried to get out; she was afraid for her life. There was a plexiglass partition in the cab with two jackets covering it. D. tried to pull one jacket down so that someone could see what was happening and come help her, and the driver froze, and said, "'Bitch, you rip that jacket, that jacket means everything to me.'" He said it was a Michael Jordan jacket, and started punching her in the face repeatedly until she almost passed out. The driver flipped D. over and put her in a headlock, putting pressure on her throat and lying on top of her. He said, "'you know how you do a cat [when] his eyeballs start popping out, when you grab him by the throat?'" and "'[s]ee how easily I could kill you, bitch?'" D. was screaming loudly and he tried to cover her mouth.

The driver told her to go get her clothes out of the far back and she did so, smiling and trying to play along; she had been in the business a long time and knew how to stay safe. The driver calmed down and she tried to get out. He pushed her back in and told her to put the jacket back up, but she refused. He said he would let her go now but would think about killing her later. He held up a wad of money and asked her if she wanted it, but D. said no because she was afraid he would pull her back into the van. She ran up the street to where there were some businesses.

D. was afraid to go to the police because the driver had threatened to kill her, but after a few days she went because everyone told her she had to report the attack. She had black eyes and scrapes on her face. She did not positively identify anyone in a photographic lineup, but did say that two photographs, numbers 2 and 5, might be her assailant. Clay was in position number 5. She did not identify Clay at the preliminary hearing or at trial.

10

LAPD Officer Jose Soto testified that he interviewed D. on November 24, 2008. She told him her assailant was black with a muscular build, and had placed gloves on his hands, which were scarred. The van was yellow-green and fluorescent with a plexiglass partition, and the back seat was folded down. Officer Johnson testified that D. told her the attacker wore a dark stocking cap.

**Arrest and investigation**

LAPD Officer Daniel Jara testified that in December 2008 he received a crime alert about a wanted kidnap/sexual assault suspect. He kept the crime alert notice in his police car. At 10:15 p.m. on January 21, 2009, he was flagged down by a woman near Gladys and 7th Street. He then noticed a taxi. In the dark, it was hard to see the color. When Officer Jara drove closer, he saw that the taxi was blue and yellow and the driver, Clay, looked like the person on the composite that accompanied the alert. Officer Jara did a traffic stop. He asked Clay what race he was because in the dark, Clay, who was black, also looked Hispanic. Clay was stocky with a light facial mustache and scars on his hands. The rear of the second seat of the vehicle was torn. Officer Jara and his partner decided to arrest Clay, and they handcuffed him and took him to the station.

Detective Contreras searched Clay's home pursuant to a warrant. He recovered a black beanie cap, and a jacket with a Michael Jordan emblem. The cab upholstery in a photo appeared to be tan and gray. There was some damage to the back part of the second seat.

LAPD Criminalist Elizabeth Swanson searched the vehicle, which was a 2002 Chevrolet Astro van being used as a Checker taxicab, with bucket seats in the front and two bench seats in the back. The van was messy with clutter on the floor, and had a sliding rear door. A pair of fingerless black gloves, two tubes of aloe vera gel, and a bag of a white powdery substance were recovered. The cushions on the two back seats tested positive for semen. Detective Alvarado, who supervised the search, stated that he did not try to lift fingerprints because many people had used the taxi and the cloth seats would not provide prints. An LAPD criminalist testified that cuttings from both back seats

tested positive for semen, with secretions consistent with saliva, vaginal fluids, and blood.

The president of the Los Angeles Checker Cab Cooperative testified that Clay was a full-time driver who drove taxicab number 3453. Every cab driver had scheduled airport days, which they did not usually miss although they could drive anywhere on those days. Clay had airport days on August 22, 2008, November 15, 2008, December 20, 2008, and December 25, 2008.

Los Angeles County Sheriff's Department Sergeant John Powell had 10 years of experience with tracking devices on vehicles under criminal investigation and formal training in using global positioning system (GPS) tracking. He testified that he had plotted the Checker Cab GPS records for Clay's taxi van on November 29, 2008 (the day L. stated she was assaulted), which showed that from 8:45 p.m. to 8:56 p.m., the cab was east of San Pedro Street and south of 7th Street in the Skid Row area, and at 9:04 p.m., the cab was at 8th Street and Los Angeles Street. The taxi headed south, drove around in the area of Washington Boulevard and Maple Street, and then stopped for an hour and 20 minutes near Stanford Avenue and Washington Boulevard. Around 10:36 p.m., the taxi traveled to San Pedro Street and 14th Street.

LAPD Detective Monica Cross testified regarding her compilation of the photographic lineup shown to the victims, and her showing of the photographic lineup to Linda and D.

Officer Johnson was the investigating officer, and she testified (over defense objection) that at her direction, a computer crime analysis had been run in a department database, using broad parameters similar to the crimes in issue (area, sexual assaults and kidnapping, outside or taxicab, black suspect 35-45 years old). She had reviewed the results. After Clay's arrest on January 21, 2009 through August 13, 2012, there were no reports of similar sexual assaults involving a taxicab driver and a woman.

**Defense evidence**

Dr. Mitchell Eisen, who had a doctorate in psychology, had testified in numerous cases about memory, eyewitness memory, and suggestibility. He had not interviewed

12

any of the witnesses, and was not in court to testify about the accuracy of eyewitness identifications in this case. Memories closer in time to an event were fresher, more detailed, and more accurate, making an initial report the best indication. Chronic use of crack cocaine can disrupt memory. In proper live and photographic lineups, no individual should stick out from the group. If only one suspect had the skin tone that a witness described, for example, that suspect would be more likely to be picked by the witness. If the lineup contained only one suspect with such a characteristic, or if the supervisor of the lineup did not properly admonish the witness or talked to the victim to somehow suggest one individual might be more familiar, it was possible that multiple witnesses could select the wrong person. There was no difference in accuracy between live and photographic lineups. Multiple identification procedures increased the likelihood that the witness would select the same individual initially selected, even if the actual perpetrator appeared elsewhere in the second procedure. Studies had shown that false identifications in sexual assault cases can occur even when a woman was exposed to an attacker for long periods of time. On cross-examination, Dr. Eisen clarified that he had no opinion about the procedures used by the police in Clay's case.

Dr. Ronald Markman, a psychiatrist, testified that the use of crack cocaine impaired cognition and the ability to interpret events. Klonopin, a medication for schizophrenia, would lessen a schizophrenic's tension and anxiety, but would not change the impaired thought process.

A defense investigator who attended the live lineup for Laura in April 2009 testified that after the witness picked an individual, all the individuals were asked to step forward, and then the person conducting the lineup told Clay to open his eyes. Maryetta Marks, Clay's attorney at the preliminary hearing, testified that she was at the lineup and the witness had picked the individual in position number 3 before the detective asked Clay, who was in position number 2, to open his eyes. The witness thereafter added position number 2 to her identification. Marks did not include this in her objections to the lineup, thinking she was not allowed to, although she did make a complete objection to the lineup at the preliminary hearing.

13

Hari Williams testified that he lived in the same apartment complex as Clay, and in 2008 Clay had low cut hair and wore baseball caps. Williams never saw Clay's hair long. Clay had a peaceful nature. Almarko Taylor testified that Clay worked with her as a 911 dispatcher at the Chicago Police Department and they dated for about a year, until he moved to California in 2002 or 2003. Clay was circumcised, and was a gentle, loving person.

Boris Rozman testified that he was a board member at Checker Cab and leased a cab to Clay from 2007 to 2009. Clay was not the first driver to use the cab. Clay's cab never had a broken seat and was always in decent shape, although a photograph showed torn upholstery. Clay was always nice and polite and there were no complaints about him. A different company, United Independent, had green and white cabs and two other companies had green cabs. Clay was around six feet tall, and Rozman had never seen him bald, or wearing a ski cap.

Vicente Vasquez was the on-site operations manager at Checker Cab. GPS records showed the following locations of Clay's cab, in 30-minute intervals, between 8:00 p.m. and 11:00 p.m.: August 22, 2008, near the airport, South Gate, and on the 105 freeway; November 15, 2008, near and at LAX, and heading back downtown on the 110 freeway; November 20, 2008, at the airport, Olympic and Fairfax, and West Hollywood, and back at the airport; December 20, 2008, at the airport and in Torrance.

Defense counsel recalled Laura as a witness, who testified that on September 20, 2011, she was served with a subpoena to testify in another person's criminal case. She had told a police officer that the person had robbed her. She had called it a robbery because the person had taken her money and given her some "bunk dope," drugs that were not really drugs. Laura told the police that she thought selling her bunk dope was the same as stealing her money.

Defense counsel also called Officer Johnson, who explained that L. had initially stated that the sexual attack took place on November 29, and a month later stated it occurred on the day after Thanksgiving. At one point, L. described the location as Maple Street and 20th Street.

**Rebuttal evidence**

DNA analyst Stephanie Sivak testified that she had analyzed the cutouts from the cab's seat cushions, and the sperm on the samples matched Clay's DNA.

**Postverdict proceedings**

Clay provided the court with a list of concerns about the conduct of the trial, and the court relieved trial counsel and appointed new counsel. Clay's counsel filed a 92-page motion for new trial, arguing that the trial court erred in admitting the evidence that after Clay's arrest there had been no more sexual assaults by cab drivers, and failed to allow the defense to present evidence that Linda had reported an unrelated sexual assault in which the medical records were inconsistent; the evidence was insufficient; trial counsel provided ineffective assistance; and the prosecutor committed misconduct. The respondent filed an opposition. Clay filed a 10-page handwritten addendum to the motion for new trial raising numerous issues as objections to his trial attorney's strategy and performance.

On September 6, 2013, the trial court sentenced Clay and denied the motion for a new trial. Clay filed this timely appeal.

## DISCUSSION

### I. Clay has not shown that his counsel provided ineffective assistance.

**A. Counsel did not provide ineffective assistance by failing to challenge or excuse Juror No. 11.**

On the first day of voir dire, after the prosecutor read a list of potential witnesses including "Officer D. Joseph," prospective Juror No. 27 stated: "I heard T. Joseph. I do know an officer T. Joseph by the name of Ted Joseph." The court promised to address the issue if the juror was seated.

The next day the juror was seated as Juror No. 11. Juror No. 11 said he did not think anything would prevent him from being fair, but "[he] was the one [who] raised [his] hand yesterday, about one of the potential witnesses, [he didn't] think that would bias [him], but [he] can't say for sure." The court asked if the witness was a law enforcement officer and the juror answered yes. Asked if Juror No. 11 had a friendship

15

with the witness, the juror answered, "I've known him for quite a while," as they had attended elementary school and high school together, and their children went to the same elementary school. Juror No. 11 said he understood that his relationship could not affect the scrutiny of the witness's testimony, and both sides would get a fair trial from him. At sidebar, the prosecutor explained that Officer Joseph, if called, would testify about the victims' prior statements, and defense counsel said, "What I need to know is if it's the right Joseph. Because I thought he said T." On questioning from the court, Juror No. 11 agreed that the first name of the person he knew was Deon.

Later, defense counsel told Juror No. 11 that "from what you said, he's really a buddy of yours," and Juror No. 11 answered, "Yeah." Their youngest children went to elementary school together, and Juror No. 11 still had contact with Officer Joseph through the school. Juror No. 11 agreed that he "really like[d]" Officer Joseph. Defense counsel asked if that would affect his assessment "whether he's being truthful or not," Juror No. 11 replied, "I would hope not. I've known him for a while. I hope I wouldn't have preconceived notions about him. I would hope. I hope he would be honest." Defense counsel continued that her concern was that "you look at him and analyze his testimony the way any other witness would testify. I know you know him and it's going to be tough, but do you think you can do it?" Juror No. 11 replied that the verdict had to be based on the evidence. The court explained that the concern was whether Juror No. 11's relationship would lead him to give Officer Joseph "any preferential treatment," and Juror No. 11 replied, "That's not my goal. That's not what I'm trying to do." Counsel for Clay responded, "That's good enough." Later, defense counsel asked whether anything in the jurors' backgrounds interfered with being a fair juror, and Juror No. 11 stated, "I'll be fair."

Defense counsel did not challenge Juror No. 11 for cause or use a peremptory challenge, and Juror No. 11 sat on the jury throughout trial. At trial, Officer Joseph testified regarding his interviews with victims L. and Laura. Clay raised counsel's failure to challenge the juror in his claims of ineffective assistance in his addendum to the motion for new trial.

16

A criminal defendant has a constitutional right to trial by an impartial jury. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) An impartial juror is capable to decide the case solely on the evidence before the juror. (*In re Hamilton* (1999) 20 Cal.4th 273, 294.) Juror bias may be implied "when the existence of the facts as ascertained, in judgment of law disqualifies the juror" (Code Civ. Proc., § 225, subd. (b)(1)(B)), and a party may challenge a juror for implied bias, including "[t]he existence of a state of mind in the juror evincing enmity against, or bias towards, either party." (Code Civ. Proc., § 229, subd. (f).) "A prospective juror's ability to be fair and impartial is explored during the process of voir dire," which can result in challenges for cause or peremptory challenges based on responses by the prospective juror. (*People v. Duran* (1996) 50 Cal.App.4th 103, 111.)

Clay argues that his trial counsel's failure to challenge Juror No. 11 constitutes ineffective assistance of counsel. To succeed on this claim, Clay must demonstrate that "'counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms.'" (*People v. Ledesma* (1987) 43 Cal.3d 171, 216.) We presume that counsel's performance was within the wide range of reasonableness, and that counsel's actions can be explained as a matter of trial strategy. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) On direct appeal, we "'"'will reverse convictions . . . on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational [basis] for [his or her] act or omission.'"'" (*People v. Lucas* (1995) 12 Cal.4th 415, 437.) Clay must also show prejudice, by demonstrating that if counsel had not performed ineffectively, there is a reasonable probability that the outcome of the trial would have been different. (*Ibid.*)

After Juror No. 11 stated that he had a friendship with Officer Joseph, defense counsel examined the juror in an attempt to rehabilitate him. That attempt at rehabilitation, however, did not result in an unequivocal statement from Juror No. 11 that he could evaluate Officer Joseph's credibility without being influenced by his friendship with the officer, who he "really like[d]." Instead, the juror stated only that he "would hope" he could objectively judge Officer Joseph's credibility. Juror No. 11 also stated, "I

hope he would be honest," which could be interpreted as a strong desire to find the officer credible.  Pressed further by the court, the juror stated that it was not his goal to give Officer Joseph preferential treatment.  That falls short of a firm profession of objectivity, and counsel should have continued to examine Juror No. 11 until it was clear whether he could be fair despite his friendship with the witness.

Nevertheless, although the examination did not go far enough, defense counsel examined the juror and "made the effort to rehabilitate [the juror] and to make clear in [the juror]'s own mind that [the juror] could be a fair and impartial juror.  Such conduct shows defense counsel had some reasonable justification for wanting to keep [the juror] on the jury."  (*People v. Lloyd* (1992) 4 Cal.App.4th 724, 735; see *People v. Kipp* (1998) 18 Cal.4th 349, 367–368.)  The record does not disclose that counsel did not have a tactical reason for failing to challenge Juror No. 11, whose answers and demeanor during voir dire might have made counsel believe that in spite of his connection to Officer Joseph, he was a favorable juror for Clay's defense.  "Counsel, who were also able to observe [the juror]'s personality and demeanor, might have formed the impression that, despite his views, this panelist would indeed perform fairly, and would not be a liability as a sitting juror."  (*People v. Mai* (2013) 57 Cal.4th 986, 1046.)  On this record, it was not a "'demonstrable reality'" that Juror No. 11 could not perform his function (*People v. Holt* (1997) 15 Cal.4th 619, 659), and we cannot say that any reasonable defense counsel would have requested his removal.

We also see no reasonable probability that the outcome of Clay's trial would have been different if Juror No. 11 had not been on the jury.  Officer Joseph testified regarding his interview at the police station with Laura, including her statement that her assailant was uncircumcised, and refreshing his recollection with the police report.  He also testified regarding his interview with L., again refreshing his recollection by looking at his summary.  Defense counsel cross-examined him regarding the date that Laura stated she was attacked and whether Laura had seen her attacker on prior occasions.  She also questioned Officer Joseph about whether L. said she was high when she was attacked and whether she was "loaded most of the time," to which he replied that she had been high a

couple of the times that they interacted. Officer Joseph also confirmed that L. had told him her attacker was Hispanic. Officer Joseph's testimony supported two aspects of the defense argument that the attacks happened but the assailant was not Clay: Laura said the attacker was uncircumcised and Clay was circumcised; and L. had told Officer Joseph that her attacker was Hispanic and Clay was black. If Juror No. 11 had a predisposition to believe Officer Joseph's testimony, that might have actually aided the defense. Clay does not identify any way in which a belief that Officer Joseph was credible would have prejudiced him, and we find no prejudice from defense counsel's failure to challenge Juror No. 11 on the record on direct appeal.

Further, Clay was not deprived of his right to a fair trial by the presence of Juror No. 11 on the jury. Clay relies upon *People v. Tidwell* (1970) 3 Cal.3d 62, 64, a death penalty appeal in which the appealing defendant argued that the trial court erred in denying motions for change of venue both before and after jury selection. The victims, who were brutally murdered, included well-known members of a small community, and "the press and public were apprised of virtually every detail in the investigation of the crimes." (*Id.* at p. 70.) In addition, "[t]he process of jury selection corroborated the defense affidavits," in one of which defense counsel averred that each time he referred to his appointment in the case, he received rejoinders from "'"I don't envy you your impossible job"'" to "'"Why don't they just turn them [the defendants] loose, we'll take care of them."'"" Another affidavit detailed a survey of 500 adults throughout the county, which showed that the majority thought they knew a lot about the case and the vast majority thought they would not be able to set aside their views and try the case fairly. (*Id.* at pp. 66, 73.) After conducting "an independent review of all relevant circumstances to determine whether a trial judge's denial of a motion for a change of venue deprived defendant of a fair . . . trial," the court held "the trial judge in the instant case was presented before *voir dire* with persuasive evidence that a fair trial could not be had in Lassen County." (*Id.* at pp. 68, 71.) The jury eventually selected included 10 people who had discussed the case with others, eight who knew one or more witnesses, and four who knew one or more of the victims. (*Id.* at p. 67.)

The trial judge also denied a motion for change of venue after jury selection was complete. (*People v. Tidwell*, *supra*, 3 Cal.3d at p. 68.) Although all the jurors had stated they would sit impartially, the court concluded: "Permitting a panel largely composed of acquaintances of victims to adjudicate an accused's guilt can only thwart the policies which demand that sympathy play no part in a juror's deliberations on the issue of guilt [citations] and that evidence concerning the character of a victim generally be excluded from the jury's consideration," and "the fact that jurors have known witnesses as old friends infects the whole process of guilt adjudication." (*Id.* at pp. 73–74.) Our Supreme Court concluded: "'It would be a judicial murder to affirm a judgment thus rendered, when the reason of the people of a whole county was so clouded with passion and prejudice as to prevent mercy, and deny justice,'" and reversed the judgment, remanding for the trial court to determine where a fair trial could be had and to transfer the case accordingly. (*Id.* at pp. 76–77.)

In this case, we do not engage in de novo review of denials of motions for change of venue in a sensational triple murder case in a small county, nor are we faced with a jury comprised of individuals almost all of whom had discussed the case, eight of whom knew one or more witnesses, and four of whom knew one or more of the victims. Clay did not receive an unfair trial, as he has not "demonstrate[d] a 'reasonable *probability* of prejudice.'" (*People v. Sanders* (1988) 203 Cal.App.3d 1510, 1514.) In *Sanders*, the trial court allowed a sworn juror who had been excused for cause to testify that he had twice seen the defendant sell marijuana to his brother. (*Id.* at p. 1513.) The court of appeal concluded that the entire jury's "intimate association" with the former juror witness during two days of voir dire, including additional time spent together in the hall and in the jury assembly room, presented a reasonable probability of prejudice. (*Id.* at p. 1515.)

Juror bias "may be presumed only in 'extreme' or 'extraordinary' cases." (*Fields v. Brown* (9th Cir. 2005) 431 F.3d 1186, 1196.) No extraordinary circumstances as were present in *People v. Tidwell*, *supra*, 3 Cal.3d 62 and *People v. Sanders*, *supra*, 203 Cal.App.3d 1510 exist here. Nothing in the record indicates that it is reasonably probable

that allowing Juror No. 11 to hear the case prejudiced Clay and violated his right to a fair trial.

**B.      Counsel did not provide ineffective assistance in failing to move to suppress the identifications.**

Clay argues counsel was ineffective in failing to file a pretrial motion to suppress the four victims' identifications of Clay.  Clay raised this issue in his motion for new trial.  Clay was represented by four different counsel through trial:  Maryetta Marks at the preliminary hearing on December 7, 2009; appointed counsel Vincent Oliver from December 29, 2009 to February 24, 2010; private counsel Alec Rose from February 24, 2010 to November 16, 2010; and appointed counsel Sue Brown from November 16, 2010 through trial.  None filed a motion to suppress the identifications.

On appeal, Clay describes the preliminary hearing and trial testimony about the various identifications, and maintains that it was ineffective assistance not to file a suppression motion because Clay "stood out in the six-pack lineup, the photographic identifications and live lineup was held on the same day for Linda and L., Linda and L. viewed the live lineup in the same room together, the individuals in the live lineup lacked similarity, and attention was directed to [Clay] during Laura's live lineup."  Clay bears the burden to establish that the identification procedures were unduly suggestive. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412.)  To determine whether an extrajudicial identification is so unreliable as to violate due process, the court ascertains "(1) 'whether the identification procedure was unduly suggestive and unnecessary,' and if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances." (*People v. Wash* (1993) 6 Cal.4th 215, 244.)  Beyond repeating trial testimony, Clay provides almost no additional analysis to explain how the procedures were unduly suggestive or that the identifications were thereby unreliable.  We nevertheless briefly address his general contentions.

Whether Clay stood out in the six-pack photographic lineup was thoroughly examined at trial.  Detective Cross testified about her compilation of the lineup, explaining that she searched the database based on gender, ethnicity, and age for pictures

21

similar to Clay's. She then looked for pictures with similar facial features, facial hair, similar background and format, and similar clothing. Clay was in position number 5, randomly selected by a computer; another suspect was in position number 6. He was lighter than the men in the other photographs. Clay also had facial hair on his upper lip and chin; the individuals in position numbers 1, 2, 3, and 4 had hair around their chin area. The hair on the individuals in position number 4 and position number 5 (Clay) was similar.

Detective Cross also testified that when she showed the photographic lineup on separate occasions to D. and Linda, she read them the standard admonition and handed them the lineup face down, without suggesting in any way which photograph they should pick out. Linda identified Clay, and D. identified Clay and another individual in position number 2. Laura testified that (like D.) she struggled to choose between Clay's photograph and the photograph in position number 2. Detective Contreras testified that he gave L. the standard admonition, placed the lineup face down on the table for her to turn over, and when L. did so she immediately identified Clay.

"[T]here is no requirement that [individuals] in a lineup . . . be . . . nearly identical in appearance." (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052.) "Minor differences in facial hair . . . [do] not make the lineup suggestive." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1217.) "The question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106–1107.)

The testimony at trial, and our own review of the photographic lineup as introduced in the trial court, persuades us that defense counsels' failure to file a suppression motion as to the photographic lineup did not fall below an objective standard of reasonableness. We see no "very substantial likelihood of irreparable misidentification" in the photographic lineup (*People v. Contreras* (1993) 17 Cal.App.4th 813, 819), especially as two of the four victims identified Clay's and another individual's photograph as possibilities, indicating that Clay's photograph did not stand out from the

22

others so as to make the photographic lineup unduly suggestive. Further, we see nothing in the procedure as described at trial to support a conclusion that the officers showing the victims the photographic lineups suggested that they choose Clay's photograph. Counsel could reasonably have concluded that moving to suppress was futile.

As to the live lineup, we do not see (and Clay does not explain) how it was unduly suggestive to show Linda and L. the live lineup on the same day as they saw the photographic lineup. Linda and L. were in the room together at the live lineup, but Detective Koman testified that they were admonished not to speak while the lineup was underway, and he was able to observe the women and saw that they made no attempt to speak to each other. When one woman became emotional, Detective Koman asked her to leave the room; she had done nothing to indicate which individual she had chosen. As for whether the individuals in the live lineup lacked similarity, Detective Koman testified that he understood the individuals selected were meant to be similar in some respects (so that the suspect did not obviously stand out), it was his responsibility to make sure the lineup was fair, and he believed it was fair. Beyond requiring that the defendant not stand out from the others, "case law does not require that a lineup contain persons resembling the defendant in appearance." (*People v. Cook* (2007) 40 Cal.4th 1334, 1355.)

Finally, Clay's claim that undue attention was directed to Clay during Laura's live lineup is not supported by the record. When she testified at the preliminary hearing, Laura did not remember that Clay was asked to open his eyes. Defense counsel and a defense investigator testified that Clay was asked to open his eyes (although counsel did not include this in her objections to the lineup), but Detective Telis testified that a photograph of the lineup showed an individual in a different position with his eyes closed, and no words were spoken to the lineup other than asking each individual to say, "'You ain't getting this money tonight.'" In any event, Linda vacillated between Clay and another individual.

As with the photographic lineups, counsel reasonably could have concluded that it would be futile to file a motion to suppress the live lineup identifications. Instead, trial

23

counsel strongly argued misidentification at trial, including the earlier counsel's objections to Linda and L.'s live lineup. "The circumstances of the identification were disclosed to the defense, they were the subject of thorough cross-examination, and the jury was able to evaluate the reliability of [the witnesses'] identification by comparing the photographs . . . to defendant's current appearance at trial. As the [U.S. Supreme Court] stated . . . [citation], '[E]vidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.'" (*People v. Alexander* (2010) 49 Cal.4th 846, 903.) Challenging the identifications during trial to plant a reasonable doubt as to Clay's guilt would have been a reasonable tactical choice, given that counsel could reasonably have believed there was only a slim chance of suppressing the victims' identifications outright.

### C. Counsel did not provide ineffective assistance in not impeaching victim witnesses for their crimes of moral turpitude.

Before trial began, the prosecutor provided a summary of the victim witnesses' crimes of moral turpitude to defense counsel, who said she planned to impeach L. At trial, defense counsel impeached L. regarding her crimes of moral turpitude (convictions for prostitution), and on direct examination D., who was in custody, admitted she had many convictions for prostitution and drug related crimes. Laura admitted on direct examination that at the time of the attack she was working as a prostitute and using crack cocaine. Defense counsel made multiple attacks on each victim's credibility based on crimes of moral turpitude, and Clay does not provide any evidence of what additional crimes of moral turpitude defense counsel should have used for impeachment. We therefore are unable to assess whether defense counsel fell below an objective standard of reasonableness in not impeaching the witnesses further.

## II. The trial court's evidentiary rulings were harmless error.

### A. Linda's 2011 sexual assault accusation

Clay argues that the trial court erred when it excluded evidence of unrelated sexual assault accusations by Linda.

Before trial began, the prosecutor advised the court she wished to "exercise our right under Evidence Code section 782 with respect to the witness Linda . . . who had filed other reports involving rape allegations." A written motion by the defense and an affidavit were required and none had been filed. The prosecutor made the same objection regarding L. The court agreed that Evidence Code section 782 required a written motion and stated it would exclude the evidence. Defense counsel did not object.

During Linda's testimony the next day, defense counsel stated she wanted to ask Linda questions about the police report "because it's not to show sexual consent on a prior occasion. It's not really to show sexual anything except to show credibility, because she says that she's raped, she's found in an alley." Counsel promised to give the court the police reports, and stated that Linda had been taken to the hospital and was examined, and there had been no findings of sexual abuse, contending: "[i]t's not [an Evidence Code section] 782 material when it's for credibility and not for consent." The court responded, "The court is mindful that whether there are actual findings by medical professionals with regard to sexual contact, those findings are often inconclusive or non-existent." Counsel replied that the report says "no finding," and the court continued, "Well, that's oftentimes the case, there are no findings, particularly when someone is extremely sexually active. But I will review those."

The same day at a sidebar, the court noted defense counsel had provided the court with "documentation that . . . chronicles an incident in 2011," apparently including medical documents. Defense counsel stated that she wished to show that Linda reported she was sexually attacked and that the medical findings contained "no sexual findings," and "[she has] the person, the nurse. She is the one that interviewed [Linda]." The prosecutor replied that she had already objected based on the lack of a written defense motion under Evidence Code section 782. The court stated, "I don't need to get there. Stop. There has been no written motion." Defense counsel argued, "It's for credibility, that there was no sexual act." The prosecutor responded, "[Evidence Code section] 782 is precisely for that purpose, to attack someone's credibility based on unrelated sexual

conduct." Defense counsel stated she would give the judge "the case on it," and the court declined to make a ruling on the spot.

Two days later, the trial court ruled that it would not admit the report of a sexual assault and the medical records. The court had read *People v. Fontana* (2010) 49 Cal.4th 351 (*Fontana*), and Evidence Code section 782 had not been complied with. Defense counsel argued that under *Fontana*, "[Evidence Code section] 782 applies if you're offering specific evidence of a victim's specific conduct to show she consented. [¶] The point that I'm making is that she wasn't raped. There wasn't sexual contact. Not that she consented to any conduct," and the statute therefore did not apply. The court replied, "you and I respectfully disagree as to the applicability of [Evidence Code section] 782 as to this factual circumstance." Neither the report of sexual assault nor the medical findings is in the record.

"Evidence of the sexual conduct of a complaining witness is admissible in a prosecution for a sex-related offense only under very strict conditions." (*Fontana*, *supra*, 49 Cal.4th at p. 362.) Evidence Code section 1103, subdivision (c)(5), provides that the rule barring evidence of a victim's sexual conduct with persons other than the defendant does not "make inadmissible any evidence offered to attack the credibility of the complaining witness as provided in [Evidence Code] Section 782." (Evid. Code, § 1103, subd. (c)(5).) Evidence Code section 782, subdivision (a), provides: "if evidence of sexual conduct of the complaining witness is offered to attack the credibility of the complaining witness," the defense shall make a written motion accompanied by an affidavit under seal stating the offer of proof, and the court shall order a hearing if the offer of proof is sufficient. If after the hearing the court concludes that the evidence is relevant under Evidence Code section 780 (regarding credibility of a witness) and the probative value of the evidence outweighs the danger of undue prejudice under Evidence Code section 352, the court may make an order stating what evidence the defense may introduce. The special procedure for evidence of sexual conduct is designed to protect victims of sexual assault and molestation "from 'embarrassing personal disclosures'

unless the defense is able to show in advance that the victim's sexual conduct is relevant to the victim's credibility." (*People v. Bautista* (2008) 163 Cal.App.4th 762, 782.)

"Evidence of a prior false report of . . . rape is relevant to the credibility of the victim. [Citations.] Prior rape complaints do not reflect upon credibility unless proven to be false. [Citations.] The trial court has discretion under Evidence Code section 352 to exclude evidence of prior reports of sexual assault if proof of the falsity of the prior complaint 'would consume considerable time, and divert the attention of the jury from the case at hand.'" (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1424, fn. omitted.) The evidence of a false report by Linda was not presented as evidence of sexual conduct but "'of the fact that she stated as true something that was false,'" and would have been admissible as relevant to Linda's credibility. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456 (*Tidwell*).) Evidence Code section 782 was thus inapplicable, as the evidence was of a false complaint, not of Linda's "prior sexual conduct or willingness to engage in sexual activity. Under these circumstances, the language of [Evidence Code] section 782 does not apply and the procedure mandated by [Evidence Code] section 782 is unnecessary." (*Ibid.*) The trial court erred in considering the evidence of a false report as evidence of sexual conduct automatically subject to the stringent procedure in Evidence Code section 782, subdivision (a), and in excluding the evidence because defense counsel did not follow that procedure.

"However, [Linda's] prior rape complaint[] would have no bearing on her credibility unless it was also established that th[e] prior complaint[ was] false." (*Tidwell*, *supra*, 163 Cal.App.4th at p. 1457.) "[I]f the trier of fact found it true that [the victim] falsely stated that [she had been raped], this statement would be relevant to the trier of fact's determination of her credibility on defendant's culpability. The evidence should have been admitted." (*People v. Franklin* (1994) 25 Cal.App.4th 328, 336.)

Although the evidence was not subject to the strictures of Evidence Code section 782, we also must consider whether it would have been an abuse of discretion to exclude the evidence as more prejudicial than probative under Evidence Code section 352. (*Tidwell*, *supra*, 163 Cal.App.4th at pp. 1456–1457.) We conclude that it would not have

27

been an abuse of discretion to exclude the evidence on that basis, because it was weak on the issue of Linda's credibility and would have required undue time to prove falsity at trial.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." While the trial court did not make an explicit finding under Evidence Code section 352, the court stated that medical exams regarding sexual conduct often resulted in findings that are "inconclusive or non-existent . . . [¶] . . . [¶] . . . particularly when someone is extremely sexually active." Although Linda testified she was not working as a prostitute the day she was assaulted, in her opening statement the prosecutor told the jury that all the victims either had been convicted of prostitution or were engaged in prostitution around the time of the attacks. In stating its doubt that the medical examination's findings were proof that Linda made a false report of rape, the trial court indicated that it considered the probative value of the evidence to be low.

In addition, from the record before us the defense would have attempted to prove, through the medical report and testimony, that at the time of the 2011 report Linda had not engaged in sexual activity at all, not that she had engaged in consensual activity and called it rape. Admitting the evidence and allowing the defense to litigate whether Linda did or did not engage in sexual activity in 2011 would have resulted in a consumption of considerable time, including at the very least testimony regarding the 2011 incident, questioning and cross-examination of Linda regarding the incident and the medical records, and apparently testimony by the nurse who interviewed Linda. As in *Tidwell*, *supra*, 163 Cal.App.4th 1447, "it is not readily apparent that th[e] prior complaint[] [was] false," and "'[t]he value of the evidence as impeachment depends upon proof that the prior charges were false. This would in effect force the parties to present evidence concerning . . . sexual incidents which never reached the point of formal charges. Such a proceeding would consume considerable time, and divert the attention of the jury from

28

the case at hand.'" (*Id.* at p. 1458.) In light of the weakness of the evidence that Linda made a false report, it was within the trial court's discretion to conclude that its probative value was outweighed by "the confusion of the jury and consumption of time it would have engendered for the parties to embark on the task of litigating the truthfulness of [the victims' former] complaints." (*Ibid.*)

We also see no miscarriage of justice in excluding the evidence. "'Evidence Code section 354 provides inter alia that an erroneous exclusion of evidence shall not cause a judgment to be reversed unless the error complained of resulted in a miscarriage of justice and it appears of record that: "(a) the substance, purpose, and relevance of the excluded evidence was made known to the court by the question asked, an offer of proof, or by any other means; [¶] (b) The rulings of the court made compliance with subdivision (a) futile; or [¶] (c) the evidence was sought by questions asked during cross-examination or recross-examination."'" (*People v. Franklin*, *supra*, 25 Cal.App.4th at p. 336.) We see no miscarriage of justice. Linda's credibility was already at issue. In opening argument, the prosecutor told the jury that she had been a prostitute. Linda testified that she was forgetful, that her attention deficit disorder affected her memory, and she took medication for schizophrenia. Defense counsel's expert testified that even with medication, schizophrenia would impact cognitive functioning and perception. In closing argument, the prosecutor addressed the credibility of all the victims: "[T]hey are prostitutes from the skid row area, and they've got mental health issues, and they've got drug issues . . . . [¶] . . . [¶] . . . [L]et's get past whatever biases you may have or you may have had about whether or not you are going to buy or believe these women and take away any biases and judge the case on its merits." Defense counsel argued in closing that Linda suffered from mental illness, and was not reliable or credible. "A trial court has discretion to exclude impeachment evidence if it is collateral, cumulative, confusing, or misleading. [Citation.] The excluded evidence, although admissible and probative, was cumulative. Therefore, although the court erred in excluding the evidence, the error was harmless." (*Id.* at p. 337.)

As for Clay's contention that the exclusion of the evidence violated his constitutional rights, he has forfeited this claim by his failure to object on those grounds. (*People v. Riggs* (2008) 44 Cal.4th 248, 304; *People v. Riccardi* (2012) 54 Cal.4th 758, 801.)

### B. Evidence that sexual assaults by cabdrivers stopped after Clay's arrest

Clay argues that the trial court abused its discretion in admitting Officer Johnson's testimony that a computer crime analysis showed that after Clay's arrest, there were no reports of sexual assaults on a woman by a taxicab driver in the area. Clay's counsel objected to Officer Johnson's testimony as hearsay, and the trial court overruled the objection. As above, Clay has forfeited his constitutional claims by his failure to object on those grounds.

Officer Johnson testified that crime reports taken by patrol officers or detectives were given to the police department's record unit, where the record clerks coded the reports using "modus operandi [(M.O.)] codes of what exactly occurred," including victim and witness information, vehicles, weapons, and specifics of the crime, and gave them a number. At her direction, a crime analysis was run in the database from the date of Clay's arrest on January 21, 2009 to August 13, 2012. Officer Johnson had the searcher use parameters "much broader" than an M.O., including the downtown area around skid row, sexual assault or kidnapping, outside or taxicab location, and a black male suspect between 5 feet 7 inches and 6 feet tall, 35 to 45 years old. Of the 56 hits that resulted, none involved a taxicab or a van. In rebuttal closing argument (again under objection), the prosecution stated: "[S]ince his arrest in January of 2009, there hasn't been any other sexual assaults involving a woman in a taxi or a taxi van. What are the odds of that? For three and a half years we haven't heard from another prostitute in the skid row area, even though during this timeframe between July or August of 2008 to about November 29th you have four. That points to his guilt."

Clay argues that Officer Johnson's testimony was irrelevant, but this argument is forfeited, as Clay did not object to the evidence at trial on relevance grounds. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 409.) We note that even assuming the

30

data reliably reflected an absence of similar crimes following Clay's arrest, there exists a myriad of explanations for that fact having nothing to do with Clay: the real perpetrator died, moved, or wanted the police to believe Clay was responsible; subsequent crimes were unreported; crimes were unreported until later (as had been some of the attacks in this case); the survey area was inadequate; the survey terms were too narrow; and others too numerous to describe. Even assuming the evidence had some marginal relevance, however, it was indamissable as hearsay.

In *People v. Hernandez* (1997) 55 Cal.App.4th 225 (*Hernandez*), the prosecution in Hernandez's trial for six violent sex offenses against two victims hoped to use in its case in chief a computer search to "show there had been no similar crimes in the geographic areas where the attacks against the two victims in this case had occurred, before Hernandez moved to California and after his arrest." (*Id.* at p. 228.) Hernandez objected to the evidence and the trial court held an evidentiary hearing, at which a crime analyst testified that she searched on a San Diego Police Department (SDPD) computer system called "Sherlock," an in-house data base. Detectives investigating sex crimes would put very specific information in a sex crimes log; "in turn, that log is given to us and we enter it, give it to a clerical support person in the crime analysis unit who then enters each item into the Sherlock system" within three to four days after a reported sex crimes incident. The crime analyst testified she did not know whether there might be any sex crimes not assigned to detectives that would not be entered into Sherlock, or whether there might be crimes reported to the sheriff that would not be included. (*Id.* at pp. 228–229.) The programs were limited to crimes in the SDPD's jurisdiction, and included separate data base files on homicides and "'unique descriptors of suspects.'" The SDPD used it daily. (*Id.* at p. 229.)

To access the information on Sherlock, a crime analyst would pick variables and define criteria, and then selected those from the system; variables contained in Sherlock included physical descriptions (height, race, sex), variables concerning the crime (date, time, location, weapon), and M.O.'s like binding or taping. For Hernandez's case, the analyst had prepared a diagram showing the two police beats where the crimes in issue

occurred, and then searched for those areas for sex crimes occurring between January 1994 and June 1995, with "'suspects that were not Black'" and a "'stranger'" as perpetrator. The search yielded eight incidents, which she reviewed and narrowed down (based on place of attack, suspect description, and the M.O) to two cases, which were the cases in which Hernandez was charged. She eliminated the others because they did not match the details of the search. (*Hernandez*, *supra*, 55 Cal.App.4th at pp. 229–230.)

The original information for Sherlock's data came from initial police reports by the investigating officer, who would turn the report over to the sex crime unit, where the information would be transferred by clerical support (or by the detective, who had editing authority as to the particular case in the log) to a log. The information was identified by specific incident, location, time, and a synopsis including key words regarding the actions of the suspect or victim, victim actions or statements, a description of the assailant, and any modifications. After the log was complete it would be given to the analyst's unit for crime analysis and inputting into Sherlock. The information entered into Sherlock "is not 'exactly what's told to the original reporting officer. It's either . . . what's in the 911 tape, or . . . what's told to the reporting officer, or . . . it's an edited version of what is told to the sex crimes detective.'" (*Hernandez*, *supra*, 55 Cal.App.4th at pp. 230–231.) The analyst did not know whether someone periodically checked to make sure all sex crimes in a beat were included in Sherlock. (*Ibid.*) A crime even just a block away from the two beats she searched for would not be included in the information she retrieved, and she did not rely entirely on the computer, also looking into sex crimes files and handwritten police reports to check on variables she had not included in her search on Sherlock. (*Id.* at p. 231.)

Over a continuing defense objection, the analyst testified regarding the process by which information was put into Sherlock from the sex crimes log, and how it was used to search for relevant data, including M.O. (*Hernandez*, *supra*, 55 Cal.App.4th at p. 236.) She explained how during the time range and in the two beats she had searched for a suspect who was not black and who was a stranger to the victim, and described the search results (eight cases, including the two instant crimes). (*Id.* at pp. 236–237.) The analyst

32

testified as to the relevant factors of the six crimes she had excluded, and pointed out that the remaining two crimes were charged against Hernandez and were the only crimes fitting the M.O. during the crime period. (*Id.* at p. 237.)

Hernandez's defense was mistaken identity, based on an expert's testimony about the difficulty with identifications in poor lighting and stressful circumstances (the attack on one victim occurred around sunset), and testimony regarding inconsistencies in the victims' identifications. (*Hernandez*, *supra*, 55 Cal.App.4th at p. 237.) The prosecutor referred repeatedly to the analyst's testimony in closing, arguing "the only logical inference" from her testimony that there were no similar crimes except when Hernandez was in the area and "after he had been in custody" was that "he must be the one who committed the charged crimes in this case." (*Id.* at p. 238.)

The court of appeal concluded that the trial court abused its discretion in admitting the crime analyst's testimony regarding her search and analysis of Sherlock data. (*Hernandez*, *supra*, 55 Cal.App.4th at p. 240.) Although computer data could at times be admitted as a business record, the issue was "the basic question of whether the sources of information for the data base of Sherlock's system 'were such as to indicate its trustworthiness.' (Evid. Code, § 1271, subd. (d).)" Police reports were not admissible as business records because they "are or might be based upon the observations of victims and witnesses who have no official duty to observe and report the relevant facts [citations]. The data base in Sherlock was taken from the sex crimes log prepared from the purported 'relevant facts' from original police reports, whatever those may be." Such information did not become reliable simply because it was "transferred to a computer," and there was "multiple hearsay" in the database. (*Hernandez*, at pp. 240, 241.) The error in admitting the testimony was prejudicial, as it gave a false aura of infallibility to the identification of Hernandez, the analyst was presented as an expert without being so qualified, and the prosecutor stressed her expertise in closing argument. (*Id.* at p. 241.) The analyst's testimony was analogous to profile evidence, whose "thrust . . . [is] to show the defendant 'fit' a certain 'profile.'" "'Evidence of other similar crimes linked to no one at all is clearly inadmissible to prove any element,'" even when there is a proximity

33

of time and place.  (*Id.* at p. 242.)  Here there was a "'vicious circle'" at work in a trial where identity was the issue, and "the prosecution via the analyst's testimony was using evidence of other crimes not yet linked to Hernandez to prove his identity and to provide that link."  (*Id.* at p. 243.)  "Under the circumstances of this case, where the outcome of the trial turned on the credibility of the two victims, whose descriptions of their attacker varied before and at trial and contained many inconsistencies and contradictions, we cannot say the trial court's error in admitting the analyst's testimony was harmless."  (*Ibid.*)

As in *Hernandez*, *supra*, 55 Cal.App.4th 225, here the evidence was used to prove there had been no similar sexual assaults in the downtown skid row area involving a taxi or van after Clay's arrest.  The computer data that had been searched was taken from police reports by the LAPD records unit, where clerks coded the information based on M.O. codes.  The details included information about the victims and suspects, vehicles, and specifics of the crime.  Officer Johnson testified that the search itself did not use an M.O. but less specific search parameters, which included three areas of south central and downtown Los Angeles, sexual assaults, kidnapping, outside or taxicab, and a black suspect 35 to 45 years old.

The LAPD database here, as described by Officer Johnson, was akin to the SDPD log in *Hernandez*, *supra*, 55 Cal.App.4th 225 as it existed before it was edited by the sex crimes unit and put into Sherlock.  The database created in the LAPD records unit was not turned over to another unit and reentered and edited into a database like Sherlock, but as with the SDPD log and the Sherlock data base created from it, the information in the LAPD database was or might be based on the observations of individuals such as witnesses and victims, who had no official duty to observe and report the details.  While some aspects of the police reports (fact and date of report, time and date made, nature of crime investigated, and names of witnesses) may have been admissible as official records based on the observations of public employees, such things as victim and witness descriptions of the suspect were not.  (*Id.* at p. 240; *People v. Baeske* (1976) 58 Cal.App.3d 775, 780–781; Evid. Code, § 1280.)  The additional layer of hearsay in

34

*Hernandez*, added by the input and editing of the log as it was entered into Sherlock, does not exist in this case, but hearsay is hearsay, and a single layer is enough to make the evidence inadmissible. The search of the LAPD database, which produced a result offered to show that no similar crimes were committed after Clay was arrested, still served as "'pseudo-scientific' testimony," which elevated to truth hearsay recorded in a computer system in a prosecutorial effort to bolster the credibility of the victims' accounts. (*Hernandez*, at p. 244.)

It was an abuse of discretion to allow the testimony regarding the results of the computer search. Nevertheless, we conclude that admitting the testimony was harmless error. The evidence of identity here was stronger than that in *Hernandez*, *supra*, 55 Cal.App.4th 225, with two victims firmly identifying Clay as the assailant before and during trial and two who identified Clay as one of two possible perpetrators. The testimony of all four victims showed a similar pattern and similar behavior by the assailant. Officer Johnson's testimony regarding the computer search was brief, and there was no evidence that she reviewed other sources of hearsay such as handwritten police reports (as did the crime analyst in *Hernandez*, at p. 231). The search run in the LAPD database for the period after Clay's arrest did not use the very specific M.O. information, but broader parameters, lessening the likelihood (present in *Hernandez*) that the jury would view it as profile evidence. Finally, the search results were not central to the case against Clay. We conclude that it is not reasonably probable that without the search results, Clay would have been acquitted.

Clay also argues that the admission of the testimony regarding crimes occurring after his arrest impermissibly referred to his custody status. He does not identify any direct reference to his custody status, instead arguing that the presentation of the evidence that there were no similar crimes in the area after his arrest and up to the time of trial necessarily suggested he was in custody thereafter. Requiring a defendant to wear jail clothing during trial impairs the presumption of innocence, and other "information, having the same tendency to remind the jury that a defendant is in custody, might have a similar effect." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1336.) Here, the

prosecution "did not refer expressly to the circumstance that defendant was in custody," and Officer Johnson's brief testimony "does not create the potential for the impairment of the presumption of innocence that might arise were such information *repeatedly* conveyed to the jury." (*Ibid.*) The evidence that there were no broadly similar crimes after Clay's arrest is equally consistent with a defendant who, although he does not remain in custody after he is arrested for the conduct for which he is being tried, sensibly does not repeat the same criminal behavior while awaiting trial. Even if the evidence did indirectly refer to his custody status, as we concluded above, it is not reasonably probable that a result more favorable to Clay would have been reached if the evidence had been excluded.

Clay argues that the prosecutor committed misconduct by commenting in rebuttal argument that the absence in the database of similar sexual assaults involving a woman in a taxi or taxi van after Clay's arrest "points to his guilt," characterizing the remarks as referring to facts not in evidence. Clay did not object on the ground of prosecutorial misconduct and thus has forfeited this claim. (*People v. Williams* (2013) 56 Cal.4th 630, 672.) In any event, while a prosecutor who states facts not in evidence in argument to the jury commits misconduct, the prosecutor referred to facts that *were* then in evidence; the prosecutor's statements did not "'tend[] to make the prosecutor his own witness— offering unsworn testimony not subject to cross-examination.'" (*People v. Hill* (1998) 17 Cal.4th 800, 828.) And although we concluded above the testimony to those facts should not have been admitted, we also concluded that its admission was harmless error. Similarly, we see no reasonable probability that Clay would have been acquitted in whole or in part had the prosecutor not referred to the evidence in closing argument.

III.  **Sufficient evidence supported Clay's convictions.**

Clay argues that there was insufficient evidence that he was the person who committed the crimes against Linda, L., Laura, and D. Our inquiry on review for sufficiency of the evidence is to "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318 [99 S.Ct. 2781, 61 L.Ed.2d 560], fn. omitted.) We do not ask

whether we believe that the evidence at the trial established guilt beyond a reasonable doubt, but rather "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Id.* at p. 319; *People v. Johnson* (1980) 26 Cal.3d 557, 576.) We "'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence,'" in light of the entire record. (*Johnson*, at p. 576.) We do not reweigh the evidence or reevaluate the credibility of witnesses, but determine whether substantial evidence supports the finder of fact's choice between conflicting evidence. (*People v. Alexander* (2010) 49 Cal.4th 846, 917.)

## A.    Count 1 (D.)

Clay argues that D. never positively identified him and points to inconsistencies in her testimony and her use of crack cocaine on the day of the incident. D. noticed that her assailant had bite marks and scars on his hands, which looked like photographs of Clay's hands shown her at trial. She identified Clay and another individual in a photographic lineup as looking like her assailant. She remembered that her assailant had gloves with cut-off fingers, had rubbed oil on her buttocks, and had what he called a "Michael Jordan" jacket. Gloves with cut-off fingers and aloe vera gel were found in Clay's taxi, and a Michael Jordan jacket was found in his home.

D.'s identification of Clay was inconclusive, but the weight to give her testimony is to be determined by the jury. (*People v. Elwood* (1988) 199 Cal.App.3d 1365, 1372.) The same is true of the circumstantial evidence of the items found in Clay's cab and his home. (*Id.* at pp. 1372–1373.) An identification of the defendant need not be positive; testimony that a defendant "'looks like'" the defendant has been held sufficient. (*People v. Wiest* (1962) 205 Cal.App.2d 43, 45.) "[U]nless the evidence of identity is so weak as to constitute no evidence at all this court cannot set aside the decision of the trial court." (*People v. Kittrelle* (1951) 102 Cal.App.2d 149, 154.) Whether D.'s drug use made her less than credible was for the factfinder to decide, and we cannot substitute our evaluation of a witness's credibility for that of the jury. (*People v. Ochoa* (1993) 6

Cal.4th 1199, 1206.) The identification evidence was sufficient to support Clay's conviction on count 1.

## B. Count 2 (L.)

L. identified Clay in a photographic lineup, in a live lineup, and at trial as her assailant. "Identification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime." (*People v. Boyer* (2006) 38 Cal.4th 412, 480.) GPS records were consistent with her account of Clay's movements. The evidentiary conflicts pointed out by Clay, and what he characterizes as "problems with her credibility," were for the jury to resolve, and we cannot second-guess their decision to convict Clay on count 2. The evidence was sufficient to support Clay's conviction on count 2.

## C. Counts 3, 4, 5, and 6 (Linda)

Linda also identified Clay in a photographic lineup, a live lineup, and at trial as the man who assaulted her. The identification is sufficient evidence, and as with the other victim witnesses, her credibility was for the jury to determine. Substantial evidence supports Clay's convictions on counts 3, 4, 5, and 6.

## D. Count 7 (Laura)

Laura identified Clay as one of two men that could have been her assailant in the photographic lineup; in the live lineup, she identified Clay and another individual. She identified Clay at trial. While she stated her assailant was uncircumcised, and medical records were introduced by the defense to show that Clay was circumcised, this conflict in the evidence (as with other conflicts in her identification) was for the jury to resolve, as was Laura's credibility as a witness. We will not reweigh the evidence. Substantial evidence supported Clay's convictions.

## IV. We need not address the motion for a new trial.

Clay lists 31 issues he raised in his motion for a new trial, and refers to his addendum to that motion in which he raised 50 additional issues. He then states that he understands the standard of review to be an abuse of discretion, and states without any analysis that the trial court abused its discretion when it denied his new trial motion.

"[W]hat is missing is any coherent argument why the . . . court should have ruled otherwise regarding [the new trial motion].  Thus, we need not say anything more about the matter."  (*In re S.C.* (2006) 138 Cal.App.4th 396, 409.)  Clay has forfeited this claim of error.  (*Id.* at p. 410.)

## V.     The cumulative effect of the errors does not require reversal.

We concluded above that the trial court erred in excluding evidence of Linda's prior rape complaint under Evidence Code section 782, and in admitting the evidence of the LAPD computer search for similar crimes after Clay's arrest.  In both instances, we also concluded the errors were harmless.  The cumulative effect of those errors does not mandate reversal.

## VI.    The trial court must resentence Clay on remand.

Clay argues, and the respondent agrees, that the trial court erred in sentencing him to eight years on count 7 (attempted forced oral copulation of Laura).  Section 288a, subdivision (c)(2)(A) provides for a three, six, or eight year sentence, and section 664 states that one-half the sentence should be applied for an attempted offense.  The maximum full term was therefore four years.  Further, section 1170.1, subdivision (a), provides that the term for each consecutive offense is one-third of the middle term of imprisonment prescribed for each other felony conviction for which "a consecutive term of imprisonment is imposed."  The middle term for forcible oral copulation is six years, and for attempted oral copulation would be three years.  One-third of that sentence would be one year.  Although section 667.6, subdivision (c) mandates a full, separate and consecutive term for each crime involving separate victims, that section does not apply to attempted crimes.  (*People v. Le* (1984) 154 Cal.App.3d 1, 10–11.)  The sentence for count 7 should be one year.

Clay argues that he is entitled to conduct credits, although he received none.  While a conviction of certain offenses and two or more prison terms for prior convictions would bar Clay from earning conduct credit (§ 2933.5, subd. (a)(1)), the record does not reflect that Clay had served any prior prison terms.  He therefore may be eligible for conduct credit under section 2933.1, which states that an individual (such as Clay)

convicted of a felony listed in subdivision (c) of section 667.5 shall accrue no more than 15 percent of work time credit, as defined in section 2933. On remand, the trial court shall determine if Clay is eligible for conduct credits and, if so, how much conduct credit he is entitled to under sections 2933.1 and 2932.

## DISPOSITION

Eric Lamont Clay's sentence on count 7 is vacated and the matter is remanded for resentencing for the trial court to enter a sentence of one year. The trial court shall determine whether Clay is eligible for conduct credit and, if so, shall modify the sentencing minute order and the judgment to reflect the amount. The superior court is directed to prepare an amended abstract of judgment reflecting these modifications and to forward a copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.